**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| SUSAN M. MANLEY )<br><br>Plaintiff, )<br><br>v. )<br><br>WASHINGTON ADVENTIST )<br>HOSPITAL, )<br><br>Defendant. ) | Case No. 18-CV-0053-PWG |

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.  INTRODUCTION

Pursuant to Fed. R. Civ. P. 56 and Local Rule 105, Defendant Washington Adventist Hospital ("WAH") submits this memorandum in support of its motion for partial summary judgment.

The Plaintiff, Susan Manley, is a former employee of Adventist HealthCare, Inc. ("AHC").[1]  Ms. Manley alleges that her employment was terminated because of her religion and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  She also alleges that she was terminated because of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*

AHC denies that it discriminated against Ms. Manley based on her religion.  Assuming that Ms. Manley's claims are true, however, as must be assumed at this stage of the proceedings, these claims must be dismissed because AHC is a "religious organization" as defined under Title

---

[1] Ms. Manley was an employee of Washington Adventist Hospital, which is a trade name used by AHC.  *See* Ex. 1 (Declaration of Kenneth B. DeStefano, at ¶ 3)  For purposes of this motion, the Defendant will be referred to as "AHC."

VII, and is therefore exempt from religious discrimination claims.  AHC is a non-profit organization which is an integral part of the Seventh-day Adventist Church ("the Church").  Its mission is to accomplish the goals of the Church's health ministry.  As detailed below, AHC's corporate membership consists of Church leaders, its senior executives are Church members, and many of its Board members are Church members and leaders.

AHC has a myriad of other religious affiliations and characteristics which are discussed in detail below.  Among other things, prayers are broadcast over the public address systems at several of AHC's facilities, and new employees are instructed during orientation concerning the organization's religious mission, and the Church's history and health mission.  AHC also holds itself out to the public as a faith-based organization.  The evidence is overwhelming that AHC's mission is "marked by clear or obvious religious characteristics." *Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 311 (4th Cir. 2004).

Accordingly, for the reasons discussed below, summary judgment should be entered in AHC's favor as to Ms. Manley's claims of religious discrimination under Title VII.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.    The Religious Characteristics of AHC

1.    AHC is a charitable and religious non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code.  *See* Ex. 1 (Declaration of Kenneth B. DeStefano) at ¶ 4.

AHC's Articles of Incorporation state that the organization is:

[A]n integral and inseparable part of the Seventh-day Adventist church (the "Church"), being an agency of that organization that is dedicated to further the Church's health ministry.  The specific purpose of the Corporation is to accomplish the goals and objectives of the Church's health ministry by providing general supervision to the health care organizations and programs owned or

operated by the Church and to promote the wholeness of man physically, mentally, and spiritually.

*See Id.* and Ex. A thereto (Articles of Incorporation) at p. 2.

2. AHC's Bylaws further explain that the organization has the following additional purposes:

 (a) To support the goals and objectives of the Church's health ministry . . .

 (c) To further by all proper and legal agencies and means in harmony with the goals, objectives and teachings of the Church, a better knowledge of the laws of life and true hygiene, the relief of suffering and the prevention and cure of disease . . .

 (h) To recruit and train medical personnel and provide a base for education in health sciences for the ministry of the Church . . . [and]

 (j) To carry out and conduct the foregoing purposes and activities directly or through one or more subsidiary organizations, to give general supervision to the health care organizations and programs owned or operated by the Church, and to establish programs designed to insure an optimum quality of health care while maintaining cost effectiveness by the sharing of systems, services, and management expertise . . . .

*See* Ex. 1 at ¶ 5 and Ex. B thereto (AHC Bylaws) at pp. 1-2.

3. AHC is a non-stock membership organization incorporated in Maryland.  *See* Ex. 1 at ¶ 6 and Ex. A thereto (Articles of Incorporation) at p. 1.  The Articles of Incorporation provide that AHC's members are the members of the Board of Directors of Mid-Atlantic Adventist HealthCare, Inc. ("MAAHC").  *See* Ex. 1 at ¶ 6.

4. MAAHC's Bylaws provide that that organization, like AHC, is "an integral part of the healthcare mission of the Seventh-day Adventist Church."  *See* Ex. 1 at ¶ 7 and Ex. D thereto (MCAAH Bylaws) at p. 2.  MAAHC's Bylaws further provide that the organization is

"affiliated or associated with, and within the general supervision of the Columbia Union Conference of Seventh-day Adventists." *Id.*

5.      The Columbia Union Conference of Seventh-day Adventists is a formal part of the Church's organizational structure. *See* Ex. 2 (Declaration of Ann Roda) at ¶ 5. The Church is governed by an entity known as the "General Conference of Seventh-day Adventists." *Id*. The General Conference, in turn, is comprised of various divisions, including the North American Division of Seventh-day Adventists. *Id.* The North American Division is further divided into nine "Union Conferences" which, in turn, are divided into local "Conferences." *Id.* The Columbia Union Conference coordinates the Church's work in Delaware, Maryland, New Jersey, Ohio, Pennsylvania, Virginia, West Virginia and the District of Columbia. *Id.*

6.      MAAHC's Directors are required to be members in good standing of the Church. See Ex. 1 (DeStefano Decl.) at ¶ 8 and Ex. D thereto (MAAHC Bylaws) at 5. Additionally, each Director must "have an interest in health care matters, an understanding of the philosophy of the operation of the Seventh-day Adventist health care facilities" and "support the specific philosophy, goals and objectives of the Seventh-day Adventist Church and its medical ministry . . . ." *Id.*

7.      MAAHC's Board members include the President/CEO of AHC, as well as the President, Treasurer and Secretary of the Columbia Union Conference of Seventh-day Adventists. *See* Ex. 1 at ¶ 9 and Ex. D thereto at p. 6. Most of MAAHC's Board members hold leadership positions in the Church. In addition to the President/CEO of AHC, and the three officers of the Columbia Union Conference of Seventh-day Adventists, the MAAHC Board includes the President of the Alleghany East Conference of Seventh-day Adventists; the President of the New Jersey Conference of Seventh-day Adventists; the Vice President of the

General Conference of Seventh-day Adventists; the President of the Potomac Conference of Seventh-day Adventists; and the President of the Chesapeake Conference of Seventh-day Adventists. *See* Ex. 1 at ¶ 9.

8.      AHC is headed by a President/CEO, and each operating unit within the organization is led a President/COO. *Id.* at ¶ 10.  AHC's Bylaws require that the organization's President/CEO, Chief Financial Officer and Executive Vice President/ Chief Operating Officer, all be members in good standing of the Church.  *Id.* and Ex. B thereto (AHC Bylaws) at pp. 8-9.

9.      The Presidents of AHC's acute care units, including WAH, were required to be members in good standing of the Church until 2019, when the Bylaws were amended to provide that such officers must either be members of the Church or must demonstrate an "ongoing commitment to the values and ideals" of the Church.  *See* Ex. 1 at ¶ 11 and Ex. B thereto at p. 9. *See also* Ex. C to DeStefano Decl. (2019 Bylaws) at p. 9.

10.     The Presidents or Senior Executives of AHC's non-acute care units are required to be members in good standing of the Church or, in the alternative, to demonstrate an "ongoing commitment to the values and ideals" of the Church.  *See* Ex. 1 at ¶ 12 and Ex. B thereto at p. 9.

11.     AHC also employs a Vice President, Mission Integration & Spiritual Care, whose primary function is to oversee the system-wide integration of AHC's mission and values, and ensure alignment with the Seventh-day Adventist Church.  *See* Ex. 2 (Roda Decl.) at ¶ 3 and Ex. A thereto (Position Description).  The responsibilities of the position include strengthening the relationship/partnership between AHC and all levels of the Seventh-day Adventist Church.  *Id.* The position requires knowledge of the history and heritage of the Adventist Church and its health ministry, teachings and ethical and religious directives.  The Vice President, Mission

Integration & Spiritual Care is also required to be a member in good standing of the Seventh-Day

Adventist Church.  *Id.* at ¶ 4.

12.     AHC's corporate Board of Trustees is appointed by AHC's members.  *See* Ex. 1

(DeStefano Decl.) at Ex. B (AHC Bylaws) at pp. 2-3.  The Board is comprised of four "ex

officio" members, consisting of the President/CEO of AHC; the Chair of the Board of MAAHC;

the Vice Chair of the Board of MAAHC; and the Treasurer of the Columbia Union Conference

of Seventh-day Adventists.  *See* Ex. 1 at. ¶ 13 and Ex. B thereto (AHC Bylaws) at p. 4.  Each of

these individuals must be a member in good standing of the Seventh-day Adventist Church.  *Id.*

The Board also includes up to fourteen "community" trustees.  *See* Ex. 1 at ¶ 13.  At least four of

the community trustees must be members in good standing of the Seventh-day Adventist Church.

*Id.*

13.     AHC's Articles of Incorporation provide that AHC's "property, assets, profits and

net income . . . are irrevocably dedicated to religious purposes."  *See Id.* at ¶ 14 and Ex. A thereto

(Articles of Incorporation) at p. 6.  The Articles further provide that, upon dissolution, any

remaining assets:

> [S]hall be distributed to [MAAHC].  In the event such entity is unable to receive
> said remaining assets for any reason at the time of the winding up and dissolution
> of the Corporation, then all of said assets shall be distributed to the Columbia
> Union Conference Association of Seventh-day Adventists, and if such Conference
> is unable to receive said remaining assets at that time, then all of such assets shall
> be distributed to such organization or organizations organized and operated
> exclusively for religious purposes as shall at the time qualify as an exempt
> organization(s) under IRC Section 501(c)(3) and as listed in the Seventh-day
> Adventist Yearbook.

*Id. a*t pp. 6-7.

14.     A devotional prayer is offered at the start of every meeting of AHC's Board of

Trustees, and at the start of most other official events at AHC.  *See* Ex. 2 (Roda Decl.) at ¶ 16.

15.     The President/CEO of AHC serves as a member of the Executive Committee of the Columbia Union Conference of Seventh-day Adventists. *Id*. at ¶ 17. The President/CEO, or a designee, attends that organization's Executive Committee meetings, and mid-year and end-of-year meetings. *Id*. The President/CEO, and the senior executives of other Seventh-day Adventist health care organizations, also attends the year-end meeting of the North American Division of the Church. *Id*.

16.     AHC makes an annual financial donation to the Columbia Union Conference of Seventh-day Adventists, for the furtherance of that organization's mission. *Id*. at ¶ 18.

17.     Newly hired AHC employees undergo an orientation program which includes a presentation from the Pastoral Care Department on the religious and spiritual nature of AHC's mission and the history and principles of the Seventh-day Adventist faith. *Id*. at ¶ 7 and Ex. B thereto (Orientation Presentation). The orientation starts with a spiritual devotional, and concludes with a prayer. *See* Ex. 2 (Roda Decl.) at ¶¶ 8, 10.

18.     The orientation includes a discussion of AHC's role as a faith-based organization. *Id.* at ¶ 8. Employees are informed that AHC's mission is to "extend God's care through the ministry of physical, mental and spiritual healing." *Id*. at ¶ 10.

19.     The orientation also covers the history of the Church, including the role of Ellen G. White as a founder of the Seventh-day Adventist Church and strong proponent of healthful living. *Id.* at ¶ 10. Employees are informed that WAH, which was located in Takoma Park, Maryland, was formerly known as the Washington Sanitarium, which was opened in 1904. *Id*. at ¶ 6. The Washington Sanitarium was funded, in part, from the proceeds from the sale of the book the "Ministry of Healing" by Ellen G. White. *Id*.

20.     The orientation also explains that the Church places a strong emphasis on diet and healthful living.  *Id.* at ¶ 9.  Thus, the presentation also covers the Church's historical advocacy of a plant-based diet, and its discouragement of the use of tobacco and alcohol.  Employees are also informed that the Seventh-day Adventist Sabbath is observed from sunset on Friday until sunset on Saturday.  *Id.*

21.     New employees also receive publications describing in detail AHC's religious affiliations and faith-based mission, as well as the tenets of the Seventh-day Adventist faith.  *See* Ex. 3 (Declaration of Donna J. Scott) at ¶ 5 and Ex. C thereto (Publications for New Employees).

22.     Each of AHC's acute-care hospitals has a chapel on the premises and offers the services of a chaplain.  *See* Ex. 2 (Roda Decl.) at ¶ 12)  AHC currently employs thirteen full-time chaplains, seven of whom are Seventh-day Adventist Church members.  *Id.*  Employees are invited to attend services on-site on significant religious holidays, such as Good Friday, Easter, and Advent.  *See Id.* and Exhibit C thereto (Invitation to Services).

23.     Prayers are broadcast over the public address systems at Shady Grove Medical Center, White Oak Medical Center and Adventist Rehabilitation Hospital twice daily, at 8:00 a.m. and 8:30 p.m.  *See* Ex. 2 (Roda Decl.) at ¶ 13 and Ex. D thereto (Examples of Prayers).  Prayers were also broadcast at WAH until August 2019, when that facility's employees and operations were transferred to White Oak Medical Center.  *See* Ex. 2 at ¶ 13.

24.     Religious artwork incorporating Bible verses reflecting AHC's mission are displayed on the walls of conference rooms at White Oak Medical Center.  *Id.* at ¶ 14.  Additionally, a sculpture of Jesus raising Jarius' daughter, as described in the Gospels of Luke, Mark and Matthew, is displayed inside the entrance of the newly opened White Oak Medical Center.  *Id.*  This sculpture is reflective of AHC's mission and the Church's health care ministry.

*Id.* Bible verses are also displayed on the walls of AHC's administrative Support Center. *Id.* A plaque displaying AHC's faith-based mission is also present in the lobby of Shady Grove Medical Center. *Id.* Photographs of representative artwork at WOMC and WAH are attached as an exhibit to the Declaration of Donna J. Scott. *See* Ex. 3 (Scott Decl.) at ¶ 7 and Ex. E thereto.

25.    AHC's activities are conducted in a manner consistent with the ethics, guidelines, and philosophy of the Church. *See* Ex. 2 (Roda Decl.) at ¶ 15.  In accordance with Church guidelines, AHC limits its services and activities on the Seventh-day Adventist Sabbath. *Id.* Elective medical procedures are generally not performed; non-clinical work is generally not performed; and leadership meetings or marketing events are not held. *Id.*

26.    Also in accordance with Church guidelines, which do not condone abortions for reasons of birth control, gender selection or convenience, such procedures are not conducted at AHC. *Id.* at ¶ 20.  Exceptional circumstances may be considered, such as when they present significant threats to the pregnant woman's life, serious jeopardy to her health, pregnancy resulting from rape or incest, or neonatal demise or survival with no or minimal cognitive potential. *Id.*

27.    The "Visitor" magazine, published by the Columbia Union Conference of Seventh-day Adventists, is available to employees in waiting areas in AHC's Support Center and in some administrative waiting areas in AHC's facilities. *Id.* at ¶ 19.  This publication is also sent to AHC's Board members.

28.    AHC makes its internal policies, and its Code of Conduct and Organizational Integrity Program, available to employees via an intranet. *See* Ex. 3 (Scott Decl.) at ¶ 3.  These policies include the "Equal Employment Opportunity" policy, which states that AHC is a

religious organization which may base certain employment decisions on religion. *Id.* and Ex. A thereto (Collected Policies) at p. 1.

29.     AHC's policy on "Mission, Vision and Values," which is also available on the intranet, identifies the organization's mission as follows: "[w]e extend God's care through the ministry of physical, mental and spiritual healing." *See* Ex. 3 (Scott Decl.) at ¶ 3 and Ex. A thereto (Collected Policies) at p. 2. This policy also states that AHC's central values include "stewardship," which is defined as "[w]e take ownership to efficiently and effectively extend God's care." *Id.*

30.     The organization's Code of Conduct states that the organization's mission is to "deliver clinical and service excellence through a ministry of physical, mental and spiritual healing." *See* Ex. 3 at ¶ 3 and Ex. A thereto at p. 4.

31.     AHC's former employee handbook, which was in effect when Ms. Manley was employed by AHC, similarly informed employees that the organization's mission included the creation of an environment "of compassion and reverence to God, through a ministry of physical, mental and spiritual healing." *See* Ex. 3 (Scott Decl.) at  ¶ 4 and Ex. B thereto (Excerpt from Employee Handbook). The handbook's equal employment opportunity policy explicitly stated that AHC is a religious corporation and may take employment actions based on religion. *Id.*

32.     WAH's employee newsletter, the "Prism," makes reference to AHC's Prayer Line, through which employees can request prayer for patients, family, friends and employees. *See* Ex. 3 (Scott Decl.) at ¶ 6 and Ex. D thereto (WAH Newsletter) at p. 4.

33.     AHC also publicizes its faith-based mission on its website, at https://www.adventisthealthcare.com/about/, which states that AHC is a "faith-based" organization whose mission is "to extend God's care through the ministry of physical, mental

and spiritual healing." *See* Ex. 2 (Roda Decl.) at ¶ 21 and Exhibit E thereto (Website Page,

"About AHC"). The website, at https://www.adventisthealthcare.com/about/mission/, also

explains that AHC's core values include "Stewardship," meaning that AHC "take[s] ownership

to efficiently and effectively extend God's care." *Id.*

34.     Advertisements for job openings, such as those published in The Washington Post

also state that AHC is a faith-based organization and state that the organization's mission

involves a ministry of physical, mental and spiritual healing. *See* Ex. 3 (Scott Decl.) at ¶ 8 and

Ex. E thereto (Employment Advertisement).

**B.     Ms. Manley's Claims**

35.     Ms. Manley, who is not of the Seventh-day Adventist faith, alleges that she was

treated less favorably than Seventh-day Adventist employees with regard to taking time off from

work. *See* Complaint (ECF # 1), at pp. 7, 8 and 10.[2]

36.     More specifically, Ms. Manley alleges that employees who were Church members

were permitted to take time off from work without being disciplined. She alleges that the

Church members prayed every day at the start of the shift, were permitted to take off on the

Adventist Sabbath, and were granted time off to attend the Church's annual General Conference

meeting. *Id.* at 8-9.

37.     In contrast, according to Ms. Manley, her manager, Miriam Prudente, who is also

a Church member, questioned Ms. Manley's requests for time off and ultimately terminated her

employment on October 13, 2016 after she took time off to attend the funeral of a relative. *Id.* at

10.

---

[2] The allegations in Ms. Manley's Complaint are taken as true for the purposes of this motion only.

III.   **STANDARDS OF REVIEW – SUMMARY JUDGMENT**

Summary judgment is proper if there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The nonmoving party, however, cannot create a genuine issue of material fact though mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

IV.   **ARGUMENT**

A.   **Ms. Manley's Religious Discrimination Claim Should be Dismissed Because AHC is a "Religious Organization" Under Title VII**

Title VII contains an exemption for "religious organizations" which states:

> This subchapter shall not apply to ... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e–1(a).

Congress established this exemption "in recognition of the constitutionally-protected interest of religious organizations in making religiously-motivated employment decisions . . . ." *Hall v. Baptist Mem. Health Care Corp.*, 215 F.3d 618, 623 (6th Cir. 2000). The exemption extends "to all activities of religious organizations," whether religious or secular. *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327, 332 n. 9 (1987).

Title VII does not define the terms "religious corporation, association, educational institution, or society," and neither the Fourth Circuit nor the Supreme Court has issued a decision addressing the specific standards to be applied. The Court of Appeals, in *Shaliehsabou*

*v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 309-11 (4th Cir. 2004), held that a Jewish nursing home was a religious institution, for purposes of the federal Fair Labor Standards Act, where the organization's "mission" was "marked by clear or obvious religious characteristics." *Shaliehsabou,* 363 F.3d at 311. *See also   Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 194 (4th Cir. 2011)(exemption applies to all Title VII claims based on religion).

Other courts interpreting the exemption have applied multi-factor tests which assess whether the "general picture of an organization is primarily religious." *See Spencer v. World Vision, Inc.*, 633 F.3d 723, 729 (9th Cir. 2011); *Hall*, 215 F.3d at 624-25 (considering various factors to determine purpose and "atmosphere" of organization); *see also LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 231 (3rd Cir. 2007) (applying nine-factor test to determine that organization's "primary purpose was religious").

In *LeBoon*, the court concluded that a Jewish community center was a religious organization within the meaning of section 2000e–1(a).  In so doing, it stated that the proper inquiry involved a weighing of "'[a]ll significant religious and secular characteristics.'" *LeBoon*, 503 F.3d at 226 (*quoting EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988)).  The court then enumerated nine factors other courts have considered in determining whether an entity qualified as a religious organization under Section 2000e–1(a):

> (1) whether the entity operates for a profit, (2) whether it produces a secular product, (3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, (4) whether it is owned, affiliated with or financially supported by a formally religious entity such as a church or synagogue, (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees, (6) whether the entity holds itself out to the public as secular or sectarian, (7) whether the entity regularly includes prayer or other forms of worship in its activities, (8) whether it includes religious instruction in its curriculum, to the extent it is an

educational institution, and (9) whether its membership is made up by coreligionists.

*LeBoon*, 503 F.3d at 226.  The court noted that "not all factors will be relevant in all cases, and the weight given each factor may vary from case to case."  *Id.* at 227.

Based on these principles, and the applicable facts, AHC is clearly a religious organization within the meaning of 42 U.S.C. § 2000e-1(a).  The evidence of AHC's religious characteristics is overwhelming, far exceeding the religious indicia that were present in *Shaliehsabou*.

### 1.    AHC's Corporate Structure, Board and Executive Team

First, AHC is organized as a non-profit, tax exempt religious corporation.   (SOF ¶ 1)[3] As set forth in its Articles of Incorporation, AHC is an "integral and inseparable part of the Seventh-day Adventist Church."  *Id.*  AHC's primary purpose, as also reflected in the Articles of Incorporation, is to:

> [A]ccomplish the goals and objectives of the Church's health ministry by providing general supervision to the health care organizations and programs owned or operated by the Church and to promote the wholeness of man physically, mentally, and spiritually.

*Id.*

In addition to this "primary" purpose, AHC has the additional purposes of "support[ing] the goals and objectives of the Church's health ministry" and "further[ing] by all proper and legal agencies and means in harmony with the goals, objectives and teachings of the Church, a better knowledge of the laws of life and true hygiene, the relief of suffering and the prevention and cure of disease."  (SOF ¶ 2)  The Bylaws also provide that AHC shall have the purpose of

---

[3] Citations to the Statement of Undisputed Material Facts appear in the following format "(SOF ¶___)."

"recruit[ing] and train[ing] medical personnel and provide a base for education in health sciences for the ministry of the Church." *Id.*

Additionally, AHC's corporate membership consists of leaders of the Church. AHC's corporate members are the Board members of MAAHC. (SOF ¶ 3) MAAHC's Board members, in turn, are the President/CEO of AHC and eight leaders of divisions of the Church. (SOF ¶ 7) These are the President, Treasurer and Secretary of the Columbia Union Conference of Seventh-day Adventists, the President of the Alleghany East Conference of Seventh-day Adventists; the President of the New Jersey Conference of Seventh-day Adventists; the Vice President of the General Conference of Seventh-day Adventists; the President of the Potomac Conference of Seventh-day Adventists; and the President of the Chesapeake Conference of Seventh-day Adventists. *Id.*

The members of a non-stock corporation are the equivalent of shareholders. *Dimensions Health Corp. v. Maryland Ins. Admin.*, 374 Md. 1, 16, 821 A.2d 40, 49 (2003). Here, as in *Dimensions Health Corp.*, AHC's corporate members have the power to appoint and remove AHC's Board members and appoint and remove the President/CEO. Thus, AHC is effectively owed and controlled by leaders of the Church. In contrast, the Jewish nursing home in *Shaliehsabou* and the corporation in *World Vision*, both of which were held to be "religious organizations," had no such formal management ties with a religious body. Similarly, while the Jewish nursing home in *LeBoon* had close ties with local synagogues, and rabbis were involved in management decisions, the organization was not owned by a religious organization. *See LeBoon*, 503 F.3d at 227-29. Thus, AHC's religious affiliations are stronger than those of the employers in those cases.

15

AHC's religious nature is further evidenced by the procedures that will apply in the event of the organization's winding up and dissolution. AHC's Articles of Incorporation provide that, in such case, any remaining assets will be distributed to MAAHC. (SOF ¶ 13) However, if MAAHC is unable to receive such assets, they are to be distributed to the Columbia Union Conference Association of Seventh-day Adventists. Finally, if the Columbia Union is unable to receive the assets, they will be distributed to one or more Section 501(3) organizations listed in the Seventh-day Adventist Yearbook. *Id.*

AHC's religious ties are also evident from its Board of Trustees and senior executives. The Board's ex officio members include Chair of the Board of MAAHC; the Vice Chair of the Board of MAAHC; and the Treasurer of the Columbia Union Conference of Seventh-day Adventists. (SOF ¶ 12) Each of these individuals must be a member in good standing of the Seventh-day Adventist Church. *Id.* As noted, MAAHC's Board consists largely of leaders of the Church. Of the Board's remaining "community" trustees, at least four must be members in good standing of the Church. *Id.*

Likewise, AHC's senior executives – the President/CEO; the Chief Financial Officer; and the Executive Vice President/Chief Operating Officer, must be members in good standing of the Church. (SOF ¶ 8) The Presidents of AHC's acute and non-acute care units must either be members in good standing of the Church or must demonstrate an "ongoing commitment to the values and ideals" of the Church. (SOF ¶ 9). AHC also employs a Vice President, Mission Integration & Spiritual Care, whose function is to oversee the system-wide integration of AHC's mission and values and ensure alignment with the Church. (SOF ¶ 11) This includes "strengthening the relationship/partnership between AHC and all levels of the Seventh-day Adventist Church."

As noted above, AHC's Board meetings (and most other official events at AHC) start with a devotional prayer. (SOF ¶ 14) *See LeBoon,* 503 F.3d at 229 (noting that board meetings began with Bible readings). AHC makes an annual financial contribution to the Columbia Union Conference of Seventh-day Adventists, and AHC's President/CEO, is a member of the Executive Committee of that organization. (SOF ¶ 15) The President/CEO, or a designee, attends that organization's Executive Committee meetings, and mid-year and end-of-year meetings. The President/CEO, and the senior executives of other Seventh-day Adventist health care organizations, also attends the year-end meeting of the North American Division of the Church. *Id.*

In sum, AHC's stated purposes and corporate structure reveal extensive ties to the Church, and a commitment to the Church's mission and values. As discussed more fully below, AHC's employment policies, and general operation, are also marked by clear and obvious religious characteristics.

2.    Religious Characteristics of AHC's Operations and Workplace

AHC's religious connections are also reflected in the organization's policies and operations. AHC's Equal Employment Opportunity policy states that AHC is a religious organization which may base certain employment decisions on religion. (SOF ¶ 28) AHC's policy on "Mission, Vision and Values" states "[w]e extend God's care through the ministry of physical, mental and spiritual healing." (SOF ¶ 29) The organization's Code of Conduct also states that the organization's mission is to "deliver clinical and service excellence through a ministry of physical, mental and spiritual healing." (SOF ¶ 30) The employee handbook that was in effect during Ms. Manley's tenure with AHC, contains similar provisions. (SOF ¶ 31)

Employees are also educated concerning AHC's religious mission, and the history and doctrines of the Church, during orientation.  (SOF ¶¶ 17-21)  This orientation, which includes a spiritual devotional, and which closes with a prayer, includes discussion of central tenets of Church doctrine, including the teachings of Ellen G. White.  (SOF ¶¶ 17, 19)

AHC's acute-care facilities all have chapels, and the organization employs thirteen chaplains, the majority of whom are Seventh-day Adventists.  (SOF ¶ 22)  Prayers were broadcast over the public address systems twice daily at WAH until that facility's closure in August 2019.  (SOF ¶ 23)  This practice continues at WAH's successor, WOMC, and at other facilities.  *Id.*  Religious artwork and iconography is displayed prominently at WOMC, at Shady Grove Medical Center, and in AHC's corporate offices.  (SOF ¶ 24)  Such artwork was also displayed at WAH.  *Id.  See World Vision*, 633 F.3d at 738 (noting religious artwork as factor in applying exemption for religious organization).

It is further noted that, in accordance with Church doctrine, AHC generally does not provide non-essential services on the Seventh-day Adventist Sabbath.  (SOF ¶ 25)  Similarly, AHC does not perform abortions except in limited circumstances, in accordance with the teachings of the Church.  (SOF ¶ 26)

Ms. Manley's Complaint, and the various attachments thereto, further evidence the religious atmosphere in the workplace at WAH in particular.  Ms. Manley alleges that prayers were held every morning as part of the daily staff meeting.  *See* Complaint (ECF # 1) at 8.  Documents associated with those staff meetings, which are appended to Ms. Manley's Complaint, further reflect AHC's mission.  The document dated March 30, 2016 states "[m]ay every patient experience 'God's care' in our hands."  (ECF # 1-8) at 24.  The document dated

November 20, 2015 states "[t]he mission of this hospital is to demonstrate God's care."  (ECF No. 1-8) at 25.

Copies of WAH's employee newsletter from 2010 and 2012, which Ms. Manley submitted to the EEOC, each display AHC's mission ("[w]e demonstrate God's care by improving the health of people and communities through a ministry of physical, mental and spiritual healing"), contain a column entitled "Chaplain's Corner," and offer a "Prayer Line" through which employees could request prayer for patients, family, friends and employees.  *See* Ex. 5 (Excerpts from WAH Newsletters).

A more recent issue of the WAH newsletter also advertises the Prayer Line, which is a system-wide service, and contains a photo of additional artwork at WAH displaying the organization's mission statement ("[w]e extend God's care through the ministry of mental, physical and spiritual healing.").  *See* Ex. 3 (Scott Decl.) at ¶ 6 and Ex. D thereto (Newsletter) at p. 3.  Additionally, the monthly magazine of the Columbia Union Conference of Seventh-day Adventists is made available in waiting areas at AHC's facilities, and in the organization's corporate offices.

3.     AHC Holds Itself Out to the Public as a Faith-Based Organization

Finally, AHC holds itself out to the public as a religious organization.  The organization's faith-based mission is displayed prominently on its website, which states that AHC's mission is "to extend God's care through the ministry of physical, mental and spiritual healing."  (SOF ¶ 33)  AHC also holds itself out to the public as a religious organization through the religious artwork displayed in public areas of its facilities, and through its job advertisements, which state that AHC is a faith-based organization.  (SOF ¶ 34)

19

## IV.    SUMMARY AND CONCLUSION

In summary, AHC's mission is characterized by clear and obvious religious characteristics.  It is therefore a religious organization under *Shaliehsabou*.  AHC is also a religious organization under the nine-factor test applied in *LeBoon*.  AHC's religious affiliations and characteristics are far greater than those at issue in both *LeBoon* and *World Vision*.

The district court's decision in *Saeemodarae v. Mercy Health Services*, 456 F. Supp. 2d 1021 (N.D. Iowa 2006) is also instructive.  In that case, the defendant was a hospital founded by members of a Catholic religious order, and its stated mission was "to continue the healing ministry of the Catholic Church and to promote the well being of the people it serves by living the values of compassion, respect, concern for the poor, excellence, and stewardship" and advanced that mission by operating various health care facilities.  *Saeemodarae*, 456 F. Supp. 2d at 1027-28.

The hospital's employees were informed of the hospital's Catholic identity and mission, and, as here, prayers were broadcast on the premises on a daily basis.  *Id.*  The hospital also displayed religious symbols throughout its facilities.  *Id.*  Based on these facts, the court determined the hospital was a religious organization exempt from Title VII religious discrimination claims and granted the defendant summary judgment.  The same result should apply here.

Based on the undisputed facts, AHC should be deemed to be a religious organization for purposes of Title VII.  Accordingly, the Court should enter summary judgment in AHC's favor as to Ms. Manley's claim of religious discrimination.

Respectfully submitted,

PARGAMENT & HALLOWELL, PLLC

Date: 11/25/19                    /s/
Jeffrey J. Pargament, Esq.
Frank C. Gulin, Esq.
1776 K Street, N.W., Suite 825
Washington, DC 20006
(202) 775-0707 (telephone)
(202) 775-0733 (facsimile)
jpargament@pandhlaw.com
fgulin@pandhlaw.com
Attorneys for Defendant